**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **JAIDYN HEWLIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:_____** |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT** |
| **CHOATE ROSEMARY HALL FOUNDATION** | ) | |
| **INC., WILLIAM GILYARD, in his individual** | ) | |
| **and official capacity, JENNY ELLIOTT,** | ) | |
| **in her individual and official capacity, and** | ) | **JURY TRIAL** |
| **ALIYA COX, in her individual and** | ) | |
| **official capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff Jaidyn Hewlin ("Plaintiff" or "Hewlin"), by and through her attorneys, Nesenoff & Miltenberg, LLP and Hayber, McKenna, & Dinsmore, LLC, as and for her Complaint against Choate Rosemary Hall Foundation Inc. ("Choate" or the "School"), William Gilyard ("Gilyard"), Jenny Elliott ("Elliott"), and Aliya Cox ("Cox") (together, "Defendants"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the forced withdrawal under threat of an improper dismissal of the Plaintiff, Jaidyn Hewlin, an incredibly intelligent, ambitious, talented, and accomplished individual, from Choate Rosemary Hall during the final days of her senior year.

2.      Defendants targeted and discriminated against the Plaintiff by failing to adequately investigate the events in question, scapegoating Plaintiff, and subjecting her to selective enforcement of school policies that were intentionally not applied to similarly situated students. Defendants' actions culminated in a wrongful finding that held Plaintiff responsible for policy

1

violations absent a substantively and procedurally fair, or consistent basis. This, despite Choate's express promise of fairness in its Handbook.

3.    In doing so, administrators of Choate: violated their own policies, failed to afford Plaintiff fundamental rights including specific notice of the charges against her and a meaningful opportunity to respond before executing the ultimatum, conducted a superficial investigation that failed to pursue all relevant evidence, treated Plaintiff disparately as compared to her peers that were present for the same event under investigation, subjected Plaintiff to questioning under inherently coercive conditions – specifically, while hospitalized and experiencing extreme physical and emotional instability, forced Plaintiff to accept a dismissal from Choate or execute a withdrawal form without being informed of the specific evidence against her and without an opportunity to question that evidence, supplemented its charges against Plaintiff after the discipline had been imposed in order to retroactively validate the erroneous outcome and sanction, and introduced post-hoc justifications for the improper decision when it became apparent that the investigative and decision-making processes were both erroneous and deeply flawed.

4.    As a result, Plaintiff suffered the unnecessary shame of the threat of formal expulsion, and a subsequent, involuntary withdrawal a mere four days prior to graduation – thereby being robbed of the diploma she rightfully earned, causing immeasurable emotional, reputational, and future educational and economic harm.

5.    Plaintiff seeks relief for the Defendants' improper actions which violated her rights under the School's own policies as well as state law.

## THE PARTIES

6.    Plaintiff Jaidyn Hewlin is a former student of Choate Rosemary Hall, who was expected to graduate in the spring of 2025. Plaintiff is a resident of the State of New York.

2

7.      Defendant Choate Rosemary Hall is an independent boarding and day college-preparatory school located in Wallingford, Connecticut.

8.      At all times relevant to this Complaint, Defendant Jenny Elliott was employed as Head of Student and Academic Life at Choate. Upon information and belief, Elliott resides in the State of Connecticut.

9.      At all times relevant to this Complaint, Defendant William Gilyard was employed as the Dean of Students at Choate. Upon information and belief, Gilyard resides in the State of Connecticut.

10.     At all times relevant to this Complaint, Defendant Aliya Cox was employed as a Form Dean and Health and Wellness Coordinator at Choate. Upon information and belief, Cox resides in the State of Connecticut.

## JURISDICTION AND VENUE

11.     The District Court for the District of Connecticut has diversity jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests.

12.     The Court also has personal jurisdiction over the Defendants on the grounds that they conduct business and are employed within the State of Connecticut.

13.     At all relevant times, the actions and events discussed herein transpired within the State of Connecticut.

14.     Venue for this action properly lies in the District of Connecticut pursuant to 28 U.S.C. § 1391 because the Defendants are all considered to reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## STATEMENT OF FACTS

### a.  *Plaintiff's matriculation and attendance at Choate*

15.     Plaintiff has excelled consistently in her educational pursuits. Beyond getting accepted into Choate, she has spent her summers: studying business at Phillips Exeter, studying law at both Columbia University and Oxford University, working for one of the top law firms in the country, and interning for a Congresswoman in Washington, D.C. Moreover, she's been on the Dean's List several times at Choate, taking mostly accelerated or honors classes, and has held several leadership positions at Choate.

16.     Plaintiff matriculated at Choate in 2021 having been accepted to other New England boarding schools and chose Choate because of the promise of an excellent education as well as the opportunity to be in an environment that promised to value each student "for their particular talents and enthusiasms" and believing it was an institution that valued equity.

17.     In her four years at Choate, Plaintiff was never placed on academic or disciplinary probation.

18.     During her final year at Choate, she applied to and was accepted (early decision) to her top choice, New York University, for matriculation in the January 2026 semester.

### b.  *Choate's conduct policies*

19.     During the relevant timeframe, Choate set forth certain policies related to student conduct matters, including the procedures to be implemented when investigating and adjudicating alleged policy violations.

20.     The 2024-2025 Student Handbook ("Handbook") provides that decisions about disciplinary response are made by the Dean of Students in consultation with the form[1] deans group.

---

[1] Choate nomenclature utilizes "Form" to identify designated grade levels. Sixth Form refers to the twelfth grade.

Specifically, "[w]hen there is reason to believe that a student has violated a school rule, the form dean will investigate the potential violation and share the findings with the Dean of Students who generally shares the matter with the form deans group for consideration."

21.     The Handbook does not define how the investigation will be conducted, or what steps will be taken to ensure the form dean's findings are accurate and supported by the evidence.

22.     The Handbook does, however, say: "it is the Dean of Students' duty to ensure that students are given fair process."

23.     The form deans group is comprised of the eight form deans, the Dean of Students, the Associate Dean of Students, and the Director of Day students. According to the Handbook, this group typically meets twice per week to discuss student matters, policies, and potential rule violations.

24.     Upon information and belief, the form deans group committee that recommended the dismissal decision during the relevant timeframe consisted of the following: (i) Patrick Dennehy, Associate Dean of Students; (ii) Katrina Linthorst Homan, Dean of the Class of 2025; (iii) Aliya Cox, Form Dean and Health and Wellness Coordinator; (iv) Jonas Atkins, Form Dean; (v) Edrik Lopez, Form Dean; (vi) Amy Howland, Form Dean; (vii) Zach Kafoglis, Form Dean; and (viii) Emily Osterhout, Form Dean.

25.     In the event a deans group determines there is a violation of school rules, the matter is addressed through either counseling, discipline, or an administrative resolution.

26.     The Handbook indicates that a disciplinary situation occurs when: (i) a faculty or staff member's attention has been directed to a specific, recent violation of the Honor Code or school rules, during or after the fact, by members of the community, Community Safety officers, or the police; (ii) a faculty member discovers a student in violation of the Honor Code or school

rules anywhere within the "reach" of the School; or (iii) when the Honor Code or school rule violation is of an egregious nature."

27.    The Handbook further notes that discipline "carries a punishment component," which can range from probation up through dismissal. A dismissal is only to be imposed when the student has violated a major school rule "in a manner that is more egregious than Suspension."

28.    When a student is dismissed or withdraws before graduation, their transcript will bear a notation of "dismissed" or "withdrawn."

29.    In stark contrast, a counseling outcome is issued when "students, parents/guardians, alums, faculty, or staff share information of a general nature about concerns regarding a student's behavior or wellbeing," resulting in supportive and informal conversations with advisers, deans, parents, and/or professional counselors. These informal conversations are viewed as private matters within the school community and as such are shared on a strict need-to-know basis. Plaintiff was not afforded any of these opportunities.

30.    Finally, an administrative response occurs when the situation is not squarely addressed by either a disciplinary or counseling outcome. Administrative responses "may carry some restrictions and punishment for the student while at school." Among the examples provided of this type of resolution are a "No-Use Policy", when a student has been placed on probation for alcohol use, or restorative practices, which provide an opportunity to discuss the situation and address the impact of the violation, none of which occurred with regard to Plaintiff in this case.

### c. *The events leading up to May 24, 2025*

31.     On the evening of May 24, 2025, Plaintiff intended to attend a gathering and stay overnight at the home of her friend E.S.,[2] a day student at Choate, along with several other female classmates.

32.     As the home was located off campus, in Fairfield, Connecticut, Plaintiff completed the required "reach form"[3] prior to the night of May 24th and obtained approval from her parents to attend the gathering.

33.     Plaintiff's parents were aware of her off campus plans, and agreed that she could attend, based on communications with E.S.'s parents on May 22, 2025, in which E.S.'s mother, L.S., confirmed that: (i) she was aware that several girls planned to stay over at her home on Saturday night; and (ii) although she would be traveling for work, her husband J.S. would be present. As well, upon information and belief, E.S.'s mother contacted the School (i.e., Michelle Dennehy – Sixth-form Dean's Assistant) during the week of May 19, 2025, to confirm that a group of girl students (including Plaintiff) would be visiting E.S.'s home for an overnight stay on the evening of May 24th through the morning of May 25th.

34.     Significantly, on May 23, 2025, the day prior to the relevant gathering, Plaintiff had sought treatment at Choate's Pratt Health Center for what was ultimately diagnosed as a yeast infection by Nurse Practitioner Mariah Anagnost ("Ms. Anagnost").

35.     Ms. Anagnost handed Plaintiff a fluconazole pill, an antifungal medication that Plaintiff took orally in Ms. Anagnost's presence, yet Ms. Anagnost failed to inform Plaintiff of the warnings or potential side effects of the medication.

---

[2] The other Choate students referenced are identified by pseudonyms.
[3] A reach form is required to be completed when a boarding student intends to spend a night or more away from campus.

36.     In particular, consuming alcohol while on fluconazole can compound the effects of each substance (e.g., dizziness, nausea, passing out) and significantly increase the risk of liver injury[4].

37.     Also, on May 23, 2025, immediately after taking the fluconazole with Ms. Anagnost, Plaintiff remained in Choate's health center to request a meeting with the Director of Counseling, Ms. Raynetta Gibbs.

38.     Plaintiff had been meeting with Ms. Gibbs regularly this term, sometimes officially and other times informally. Her discussions with Ms. Gibbs related to a former Choate student who attempted suicide in Plaintiff's presence, and eventually and unfortunately succeeded at a future date. Plaintiff had a dream about the student the night before, on May 22, 2025, and was disturbed by it.

39.     Ms. Gibbs was not available, so Plaintiff met with the Associate Director of Counseling, Lisa Kimball. Ms. Kimball spoke to Plaintiff about her dream and the suicide. Ms. Kimball excused Plaintiff from her American Diplomacy class that afternoon.

### d.  *The evening of May 24, 2025*

40.     On Saturday May 24, 2025, at approximately 7:30 p.m., Plaintiff was picked up from the Choate parking lot in a car driven by Choate senior, Sara Smith.[5] Three other female students, all seniors at Choate, were also present.

---

[4] See *Fluconazole and Alcohol Interaction: A Medically-Reviewed Guide*, ChoicePoint Health (2023), https://www.choicepointhealth.com/fluconazole-and-alcohol-interaction-a-medically-reviewed-guide/;
*Fact vs. Fiction: A Review of the Evidence Behind Alcohol and Antibiotic Interactions*, 64 Antimicrobic. Agents Chemotherapy. e02167-19 (2020), https://doi.org/10.1128/AAC.02167-19
See also: LPD fluconazole - Diflucan.PDF
[5] Sara Smith is a pseudonym.

41.     The group drove to Hamden, Connecticut where they first went to a Tesla charging station, followed by a trip to the drive-through at McDonald's, and then stopped at Hometown Wine & Liquors sometime around 8:00 p.m.

42.     Smith went into the store first, later joined by Plaintiff, while the others waited in the car.

43.     Once in the store, Smith spoke with E.S. on Facetime with other students (several males) who were already at E.S.'s house in the background while Smith and E.S discussed what to purchase.

44.     Smith purchased New Amsterdam Pink Whitney (a 10 pack of 50 ml bottles), Raspberry Smirnoff (750 ml), and Tito's Vodka (1 liter), totaling $54.08, which she paid for using her cell phone.

45.     Subsequently, the group arrived at E.S.'s house in Fairfield, Connecticut, at approximately 8:30-8:45 p.m.

46.     Between approximately 9:00 and 10:30 p.m., the group consumed alcohol and some students, excluding Plaintiff, smoked marijuana.

47.     At some point between 10:30 p.m. and 11:00 p.m., Plaintiff became incapacitated, demonstrated by the slurring of words and her inability to walk straight. She does not remember this.

48.     Her memory picks up at the point at which she arrived at Choate's Pratt Health center the following morning, May 25, 2025.

49.     It was only at Choate's Pratt Health Center while taking a breathalyzer test that she assumed that she may have been drinking, and because she was being tested for the same. In addition, her friends began to send her text messages via Snapchat to help her piece together the

events from the previous evening. Even then, Plaintiff suspected she may have been drugged because she neither remembered drinking, nor was it typical of her to drink beyond small to moderate amounts of alcohol.

50.     Though Plaintiff was supposed to stay over at E.S.'s house that night, once Plaintiff became incapacitated, upon information and belief, E.S. insisted that Plaintiff could no longer stay.

51.     As such, rather than seek assistance from E.S.'s father who was supposedly in the house, call Plaintiff's parents for help, or reach out to someone at Choate, a group of the students took it upon themselves to drive Plaintiff back to campus (likely while under the influence) and leave Plaintiff unattended in her residence hall.

52.     This decision to return to campus was not made by Plaintiff, who was unaware of her surroundings, but by several other students, placing her at great risk for her safety.

### e. *The morning of May 25, 2025*

53.     Several hours later, in the early morning of May 25, 2025, Plaintiff meandered upstairs, while in a highly disoriented state. Unaware of her whereabouts, she believed that she was still present in E.S.'s house as indicated by a statement she made to Ms. Koleva who shared the statement with Plaintiff's parents later that morning. When Ms. Koleva asked Plaintiff if she knew where she was, Plaintiff responded: "[E.S.]'s house."

54.     In actuality, she had wandered to the area where the House Mentor Ms. Koleva lived and allegedly lay down on her bed.

55.     At some point before 6:00 a.m. on Sunday, May 25th, Ms. Koleva discovered Plaintiff there and took her to Choate's Pratt Health Center.

56.     While at Choate's Health Center, Ms. Koleva and the nurse questioned Plaintiff about the previous evening, and Plaintiff repeatedly said that she could not remember how she returned to campus.

57.     Also, while at Choate's Health Center, Plaintiff, in a frightened but lucid state, called her father to let him know what was happening.

58.     The Choate nurse treating Plaintiff told her father that the nurse believed Plaintiff had been drinking at a party the night before and woke up disoriented. She further reported that Plaintiff had taken a breathalyzer test which showed a lethal blood alcohol level of .4.

59.     The Choate nurse disclosed, however, that the breathalyzer test was not working properly and was giving inconsistent readings.

60.     Nonetheless, in an abundance of caution and in reliance on the information the nurse at Choate's Pratt Health Center shared, Plaintiff's parents agreed with the recommendation to transfer Plaintiff to the Yale New Haven Children's Hospital Emergency Room.

## f.  A false narrative coupled with the blame game begins to emerge

61.     While in route to New Haven to meet their daughter, Plaintiff's parents reached out to E.S.'s parents to gather more information about what had happened the night prior.

62.     E.S.'s mother shared what Plaintiff's parents later discovered was an emerging false narrative regarding the circumstances of Plaintiff's departure from the party.

63.     Specifically, the mother falsely reported that Plaintiff had left the party via Uber to meet an unknown male student whom she had been seeing for several months, who likely dropped her back to her dorm.

64.    Importantly, this fictitious male drove a white Telsa which was the same car driven by Smith, who drove the girls to the party the night before and who was later discovered to have driven the Plaintiff back to her room when she became incapacitated[6].

65.    While still in route to New Haven to meet their daughter, and after speaking with E.S.'s mother, Plaintiff's parents spoke via telephone to E.S. and Betty Boe[7] together. E.S. and Boe  shared the same false narrative about an unknown male student who likely returned Plaintiff to her dorm.

66.    Plaintiff was admitted to the emergency room at New Haven Children's Hospital at approximately 7:00 a.m.

67.    At or before 8:33 a.m., Dean Dennehy came to the emergency room to begin questioning Plaintiff about the night before. At the time, Plaintiff had an IV in her arm, was under examination, and was undergoing tests by nurses and doctors. Also, Plaintiff was experiencing discomfort in her vaginal area. That, in tandem with not remembering what happened the night before, caused Plaintiff to question whether she was physically compromised (at the party, on the way back to the dorm, or even in her room). Plaintiff shared this concern with the medical team (Dean Dennehy and Ms. Koleva were present); however, Plaintiff did not accuse anyone of violating her because she had no specific memories of being violated. Plaintiff was also contending with external emotional pressures, including persistent messages from friends on Snapchat urging Plaintiff to protect them by upholding the collective's narrative that Plaintiff left the party early to meet a guy named "Q." This peer-pressure induced narrative was not for the benefit of Plaintiff, who was already presumed a violator of the rules, but rather designed to protect the student who

---

[6] Plaintiff's housemates confirmed that Plaintiff was brought home in a White Tesla, which later was discovered to belong to Smith, not "Q."
[7] Betty Boe is a pseudonym.

drove Plaintiff back to the dorm, the other students who accompanied the driver, and to shift attention away from the alcohol and drug use of the party's attendees. This convergence of physical, emotional, and social stressors, all while anticipating the arrival of her parents, naturally placed Plaintiff in a heightened state of anxiety.

68.    Dean Dennehey's decision to initiate questioning at this moment—when Plaintiff was isolated from legal or familial support and under acute distress—amplified the inherent power imbalance. As a high-ranking institutional authority (i.e., Assistant Dean of Students), the Dean wielded significant influence over Plaintiff's academic standing and disciplinary fate.

69.    During the conversation, Dean Dennehy told Plaintiff that her friends were "blaming her" for bringing the alcohol and that things would turn out "better" if she "told the truth." This information was shocking and disconcerting to Plaintiff in light of the peer pressure to protect the party participants, particularly those who brought Plaintiff back to her dorm.

70.    Dean Dennehy's framing of the situation mirrored a classic prisoner's dilemma: Plaintiff was led to believe that her peers had already implicated her, and that her only path to a favorable outcome was to cooperate (i.e., confess before further blame accrued). The suggestion that "it would turn out better" if she "told the truth" was not a neutral encouragement but a veiled threat, implying that silence or denial would result in harsher outcomes.

71.    Taken together, the timing, setting, and framing of Dean Dennehy's questioning rendered the interaction inherently coercive. Plaintiff was not afforded a meaningful opportunity to reflect, consult, or resist. Instead, she was cornered into responding under duress being physically, emotionally, and psychologically isolated from any legal or familial support.

72.     Evidence of the psychological toll (the fear that her academic future was already in jeopardy) of the Dean's questioning was apparent. Seconds after her parents entered the emergency room Plaintiff, still reeling from the pressure, blurted out in fear: "They're going to kick me out!"

73.     Another critical moment of the conversation between Dean Dennehy and Plaintiff that took place before her parents arrived was when Dean Dennehy proceeded to inform Plaintiff that he was going to search her room.

74.     Plaintiff disclosed to Dean Dennehy that he would likely find two, small empty bottles of Don Julio in her room. In extension to the story that "Q" brought her to the dorm, Plaintiff stated that "Q" threatened to plant the bottles in the room if she did not engage in sexual activity with him. Very soon thereafter, Plaintiff's parents arrived, and Plaintiff immediately abandoned this story when her father quickly pointed out that "Q" would not have had access to the dorm. It was evident to everyone that Plaintiff had formulated this story in desperation, readily rendering the story immaterial.

75.     Around the time of this conversation, Plaintiff was conversing with her friends via Snapchat sharing what was happening with her, including that the Dean was going to search her room. As a consequence of the Snapchat exchanges, and the School's failure to conduct contemporaneous searches of the rooms and lockers of the other students, the other students had sufficient time to clear their rooms of any items that could be identified as violative of Choate's policies.

76.     Indeed, by this point, it was apparent that because Plaintiff was the one who had gotten "caught," she would be the focus of the School's disciplinary actions. The evidence of this was the School's selective enforcement. The School not only failed to conduct contemporaneous searches of the rooms and lockers; but it also willfully declined to search the rooms and lockers of

any other students despite clear Handbook guidance requiring such measures under these circumstances.

77.     Dean Dennehy informed Plaintiff and her parents that he was hearing from others on campus that Plaintiff was solely responsible for bringing liquor to the party on the night of May 24th, which was not accurate. Despite the Dean's stated disbelief of this information in front of Plaintiff's parents, his decision—presumably with Dean Gilyard's support—to single out Plaintiff's room for a search reflected a clear bias against her.

78.     A few hours later, Dean Dennehy advised Plaintiff's parents that a search of her room had uncovered the two empty bottles Plaintiff mentioned, as well as a receipt for a 350 ml bottle of Pink Whitney Vodka, which Plaintiff admitted to purchasing the night before.

79.     Consequently, Dean Dennehy notified Plaintiff that she was being placed on a Dean's leave pending an investigation.

80.     Upon information and belief, Plaintiff was the only boarding student placed on leave related to this matter.

81.     Notably, neither Dean Dennehy nor any other administrator conducted searches of the rooms or lockers of any other students who were present at the gathering the previous evening. This omission further evidences the continued pattern of disparate treatment and unjustified scrutiny directed toward the Plaintiff, contributing to her stigmatization and unequal treatment under the School's disciplinary protocols.

82.     Later that evening, Plaintiff's parents spoke with three parents, in three separate conversations, all of whom indicated that people were saying Plaintiff was the person who brought alcohol to the party, bolstering the narrative adopted by Choate that Plaintiff was solely responsible.

83.     At approximately 4:30 p.m. on May 25th, Plaintiff was interviewed by Dean Homan.

84.     During her discussion with Ms. Homan, Plaintiff explained that the two empty bottles were "connected to a prefect"[8]. The issue of "Q" was not raised as it had already been dismissed and deemed irrelevant to the scope of the investigation.

85.     Demonstrating a presumption of responsibility against Plaintiff, Ms. Homan did not ask Plaintiff when the bottles were purchased, who purchased them, or if she drank any of its contents. Evidently, the presence of the bottles alone was enough to hold Plaintiff responsible for a policy violation, presumably falling within the definition of "paraphernalia" under the Handbook.

86.     On the morning of May 26, 2025, Plaintiff and her parents received a call from Dean Homan, who explained that Plaintiff would be receiving an email later that day. According to Dean Homan, the deans group had decided that the same email would be sent to all students who attended the May 24th party. Plaintiff and her parents were told that all similarly-situated students would receive identical communications.

87.     On or about the evening of May 26, 2025, Plaintiff and her parents received the email referenced earlier that day. Although the email purported to identify all of Plaintiff's alleged violations, it was plainly a generic template because several listed violations were irrelevant to Plaintiff, and none were supported by any evidentiary basis. The inclusion of non-applicable infractions, coupled with the email's presentation as a comprehensive account, strongly suggested that other individuals committed more numerous and more serious violations under the Handbook. Two days later, despite these facts, it became clear that these other, similarly-situated individuals,

---

[8] A prefect refers to a student responsible for the dorm, similar to a Resident Assistant.

were not subject to the same disciplinary outcome, raising concerns about selective enforcement and procedural irregularity.

88.     On the evening of Monday, May 26, 2025, Plaintiff emailed Dean Gilyard and the members of the deans group to advise them of her mental health challenges leading up to the events of that weekend.

89.     Specifically, Plaintiff had sought counseling on campus throughout the spring term to help her process a situation involving a friend and former Choate student who had committed suicide earlier in the year.

90.     Plaintiff's email to the deans explained that she had most recently attended a session with Choate's counseling office on May 23, 2025, after having a dream about her friend the night before, on May 22, 2025.

91.     Plaintiff's parents reminded Dean Gilyard of Plaintiff's mental health struggle related to this issue on May 28th, twice on June 9th, and also notified Ms. Elliott in an email correspondence dated June 18, 2025.

92.     Yet, remarkably, despite multiple written communications — including Plaintiff's email to Dean Gilyard and four separate follow-up messages from her parents concerning her mental health struggles — Choate failed to respond or take any action, reflecting a troubling disregard for the Plaintiff's well-being and for its own institutional responsibilities.

93.     On May 27, 2025, Plaintiff completed and handed in her final assignments for the year for all her classes except English.

94.     Also on May 27, 2025, Plaintiff's parents received a call from a parent of another student who had attended the May 24th party. The parent relayed that, according to "the adults at the School," Plaintiff was not authorized to be at E.S.'s house that evening, citing data from the

reach form as evidence that Plaintiff had not been properly cleared to be off campus. In response, Plaintiff's parents clarified that the School had been fully informed, the arrangement had been explicitly approved, and the details had been coordinated in advance between Plaintiff's parents, E.S.'s parents, and School administrators.

95.     Dissatisfied with this explanation, the third-party parent firmly insisted that the reach form did not reflect any such approval. The parent challenged the accuracy of Plaintiff's account, stating that they had been told Plaintiff's father was listed as the host on the reach form — an assertion that contradicted the actual arrangement and further fueled confusion about the School's internal communications.

96.     Choate's reach forms are confidential records, accessible only to School personnel and the specific student and parent(s) involved. These forms are not public and are completed jointly by the student and one or both parents. There would have been no way for the third-party parent to know that Plaintiff's father—rather than her mother—had signed the original form, absent an unauthorized disclosure by the School. It became clear that confidential, yet inaccurate, information had been improperly shared, leading the parent to draw incorrect conclusions. It also became clear that misinformation concerning Plaintiff was being actively disseminated among parents during the investigation itself which intensified Plaintiff's reputational damage and further entrenched the increasingly apparent procedural irregularities that undermined the integrity of the investigation. The School's bias against Plaintiff was becoming increasingly obvious.

97.     Upon information and belief Aliya Cox, one of only two investigators released this confidential and false information on or about the late morning/early afternoon of May 27, 2025, during an active investigation.

98.     On Wednesday, May 28, 2025, Plaintiff completed and handed in her final assignments for the year for her English class.

99.     At approximately 10:45 a.m. on May 28, 2025, Dean Gilyard sent an email to Plaintiff's parents accompanied by a video wherein he indicated that Plaintiff had two options: dismissal or withdrawal from Choate.

100.    Plaintiff's parents requested a meeting with Dean Gilyard to discuss the issue and scheduled one for 3:00 that afternoon via Zoom.

101.    During the meeting, Dean Gilyard outlined the purported reasons for requiring Plaintiff's dismissal or withdrawal, yet failed to produce any evidence whatsoever, other than to state he relied primarily on the testimony of the other students. He also highlighted that a committee of deans had deliberated and recommended to Dean Gilyard that Plaintiff be dismissed.

102.    During the meeting, Dean Gilyard outlined the purported reasons for requiring Plaintiff's dismissal or withdrawal, which were noted by Plaintiff's parents:

- Plaintiff's level of alcohol was high;

- She lied while sober;

- Empty bottles were found in her room;

- Plaintiff purchased alcohol that she brought to E.S.'s house (Pink Whitney);

- Plaintiff purchased Pink Whitney (receipt found).

103.    With respect to the allegations, Dean Gilyard failed to produce any direct evidence or documentation, again relying primarily on the testimony of the students who themselves were implicated in the alleged wrongdoings of May 24th and May 25th.

104.    The one exception to this being the bottles, the presence of which are not clearly prohibited under the Handbook and which even Ms. Elliott, in an email dated July 1ˢᵗ, indicated are only "suggestive."

105.    Dean Gilyard also highlighted that a committee of deans had deliberated and recommended to Dean Gilyard that Plaintiff be dismissed. There was no room for discussion regarding this conclusion. There was no appeal process. And given that Dean Gilyard didn't provide any evidence, Plaintiff was not afforded an opportunity to challenge the evidence.

106.    Dean Gilyard provided two and only two options: Plaintiff was to withdraw or be dismissed.

107.    Plaintiff's parents inquired whether Plaintiff could still receive a diploma, notwithstanding that she was not permitted to return to Choate or participate in graduation or graduation activities.

108.    Dean Gilyard responded that Plaintiff would not receive her diploma, nor would she receive final grades for the term.

109.    Plaintiff's parents pushed back on this outcome because Plaintiff had completed all academic requirements and were troubled by the lack of any thorough or fair investigation and the haste with which they were forced to make a decision. Dean Gilyard promised to consider whether Plaintiff would receive final grades but held firm on the decision to deny Plaintiff her diploma.

110.    Plaintiff's parents pressed on this refusal, noting that the Handbook states a person who has withdrawn can still receive a diploma under "extraordinary circumstances," though such circumstances are not defined by the School's policies. Dean Gilyard indicated that he would circle back with Plaintiff and her parents on this issue.

111.    In an email dated May 28th at approximately 7:00 p.m., Dean Gilyard committed to providing Plaintiff with "End of Term" grades for the spring but held firm on the decision to accept the deans group's recommendation to dismiss Plaintiff; however, she could still choose to withdraw within the hour.

112.    In that same email, Dean Gilyard offered an unsatisfactory explanation with respect to what constituted "extraordinary circumstances," having spoken to the Head of School and noting: "while rare, there is historical precedent for a student to earn a Choate diploma post-withdrawal or dismissal, typically 3-5 years after separation. While I recognize this doesn't resolve the present moment, I felt it was important to share."

113.    Dean Gilyard's explanation regarding what constitutes "extraordinary circumstances" was not only unsatisfactory but also lacked any specific guidance on how one might satisfy the requirement. His beyond-flawed explanation failed to clarify why such precedent would be relevant to the current case or how it informs the criteria for eligibility. Moreover, his acknowledgment that "this doesn't resolve the present moment" underscores the absence of actionable standards or procedural clarity.

114.    Dean Gilyard followed up on this issue by email dated June 2, 2025, indicating that if a person were to return after 5 years and demonstrate that they have made accomplishments in terms of community service and/or academics, there is a possibility that they may be permitted to receive their degree at that point.

115.    Dean Gilyard's poor explanation failed to offer any discernible benchmarks or criteria by which such accomplishments would be evaluated. It also left unanswered why post-college achievements, particularly in community service or academics, would bear relevance to a student's eligibility for a high school diploma years after separation. The absence of a coherent

rationale or procedural framework rendered the guidance not only vague but substantively disconnected from the institutional standards purportedly governing such decisions.

116.    Dean Gilyard's communications reflected a pattern of post hoc rationalization rather than principled decision-making. The absence of clear standards, coupled with shifting and subjective criteria, undermined the integrity of the institution's disciplinary and academic processes.

117.    It also raised the specter of selective enforcement, where outcomes may hinge more on institutional convenience than on procedural fairness or consistency. In that way, Choate's consistency lies not in adherence to standards, but in its persistent disregard for them—favoring expedience over equity, and opacity over transparency.

118.    On May 28, 2025, at 7:21 p.m., Plaintiff's mother sent an email accepting the withdrawal option.

119.    On May 29, 2025, Dean Gilyard sent the withdrawal form. Plaintiff executed and returned the form on the same day.

120.    The School informed Plaintiff that her final transcript would now bear a notation of "Withdrawn Under Disciplinary Investigation" and that the transcript would be submitted to New York University.

121.    June 1, 2025, was graduation day at Choate. At this time, Plaintiff learned that most of the other students who attended the party on May 24, 2025, including those who were suspended and those who had consumed drugs, were still allowed to participate in graduation.

122.    Plaintiff and E.S. (the host of the party) were the only students involved in the relevant events who were prohibited from attending graduation.

123. Between June 2nd and June 4th, Plaintiff's parents traveled to Connecticut in an attempt to retrace Plaintiff's steps and further piece together the events of May 24, 2025, given Choate's failure to conduct any meaningful investigation before deciding to dismiss Plaintiff.

124. Plaintiff's father was able to locate the liquor store where Plaintiff witnessed Smith purchase the alcohol on the evening of May 24th.

125. Plaintiff recalled the items that were purchased, and confirmed the total amount paid by Smith to be $54.08. While visiting the store, Plaintiff's father purchased the items identified by Plaintiff and confirmed the pricing.

126. On June 3, 2025, Plaintiff's parents emailed Dean Gilyard and Dean Homan to request a meeting based on this newly discovered information and to further discuss the Dean's reasoning related to its recommendation to dismiss Plaintiff from Choate.

127. Plaintiff's parents met with Dean Gilyard and Dean Homan on June 9, 2025, via Zoom. During this meeting, they pointed out the various erroneous conclusions, in addition to the number of unsubstantiated facts relied upon, the various procedural errors, inconsistencies in the students' reports, the many inequities in how Plaintiff was treated, and overarching concerns related to Choate's handling of the matter.

128. Among other things, Plaintiff's parents established that at best, other students may have seen Plaintiff go into the liquor store. However, no one saw her purchase the items and in fact, Smith was the one to purchase the items, not to mention the fact that Smith was the driver.

129. However, because Choate's investigation lacked rigor, it began at the point where the students were already at E.S.'s house. Choate never took any steps to determine what happened in the hours leading up to the arrival at the party and had not substantiated the fact there was a stop

at the liquor store during which another student, not Plaintiff, purchased the alcohol that was distributed at the party.

130.    This was particularly problematic because had they done so, it would have become apparent that Plaintiff was not the driver of the vehicle, she was not the purchaser of the alcohol that night, and the group of girls arrived with alcohol at the party all together. It was a group, not an individual effort, and to the degree that an individual was most responsible, it should have been the purchaser and driver, not Plaintiff.

131.    Plaintiff's parents began the June 9th meeting by confirming the list of five charges discussed during the May 28, 2025, meeting. After reciting, verbatim, what Dean Gilyard told them on May 28th, Dean Gilyard responded, "[T]hat's right," thereby confirming the accuracy of Plaintiff's parents' rendering of the charges against Plaintiff as originally articulated by Dean Gilyard.

132.    In addition to stating: "that's right", Dean Gilyard then added something to the effect of: "…and entering the House Mentor's private apartment (or area)," which he framed as an additional violation of school policy.

133.    This new allegation was raised almost two weeks after the fact and therefore had never been brought up in any previous meeting and notably, had not been raised before Plaintiff was faced with the ultimatum of dismissal or withdrawal.

134.    Plaintiff's parents did not address the new allegation at that time, choosing to avoid what appeared to be a deflection, and rather focused on the charges identified (and now confirmed) on May 28, 2025, as well as the errors associated with the investigation.

135.    The School overlooked that Plaintiff was not the one driving the car, the School did not substantiate the facts surrounding the stop at the liquor store on the way to the house, and failed

to determine what types of alcohol were present at E.S.'s house beyond Pink Whitney. In fact, Dean Gilyard admitted that he knew nothing of Hometown Wine & Liquors.

136.    Importantly, the Pink Whitney that Smith had purchased at the liquor store (a 10 pack of 50 ml bottles) was not the Pink Whitney described in the receipt found in Plaintiff's dorm (a singular, 350 ml bottle) calling into question the School's unsubstantiated  supposition that Plaintiff must have been the one to purchase and bring it to the house.

137.    When Plaintiff's parents asked Dean Gilyard if he could confirm which products were present at the party, he said "no." When asked if the assumption of the deans group was that the Pink Whitney described in the receipt was the same as the Pink Whitney he believed was consumed at the party, he said "yes" and further admitted that neither he nor the group considered that the same brand doesn't necessarily equate to the same product – a very significant factual error and flaw in the process that contributed to the School's decision to force Plaintiff's withdrawal.

138.    Moreover, when asked whether the deans group was able to substantiate which other students brought alcohol to the gathering, Dean Gilyard responded, that in terms of substantiating the fact of "bringing alcohol," "only Jaidyn." Evidently, Dean Gilyard failed to recognize that the deans group's conclusions were based upon the statements of self-serving teenagers who were concerned about their ability to graduate and earn their high school diplomas within the next few days and whom had not been asked critical, clarifying questions. Resultantly, Plaintiff suffered from a false, and therefore unsubstantiated accusation that she was the primary perpetrator of bringing alcohol to the party.

139.    Faced with new considerations regarding Choate's investigation of the matter, Dean Gilyard introduced for the first time a claim that Plaintiff was found on the upper level of her dorm where Ms. Koleva lived, which was a violation of school policies.

140.    This allegation had never been brought up in any previous meeting and notably, had never been raised before, or even at the time Plaintiff was faced with the ultimatum of dismissal or withdrawal.

141.    The addition of this allegation was significant as it further demonstrated Choate's intentionality around targeting Plaintiff as the student responsible for the most and most egregious of the violations, warranting the harshest penalty.

142.    There was no dispute that Plaintiff did not intentionally go upstairs to Ms. Koleva's living space in the early morning of May 25, 2025. Instead, she was incapacitated, disoriented, and believed she was still in E.S.'s house. Indeed, Ms. Koleva was concerned enough about Plaintiff's state at the time she encountered her, that she brought her to Choate's health center and subsequently, to the emergency room at New Haven when Choate's health center was unable to provide an accurate blood alcohol count due to its faulty breathalyzer.

143.    Choate supplemented the charges against Plaintiff, in a post-hoc rationalization of its erroneous decision to dismiss Plaintiff and prevent her from attending graduation.

144.    Additionally, during the June 9th meeting, Dean Gilyard made a remark suggesting that the Don Julio bottles previously described by everyone else as empty, contained "some alcohol in them." This represented a newly introduced allegation that, if accepted, would have escalated the matter from mere possession of paraphernalia to actual possession of alcohol. However, when challenged by Plaintiff's parents, Dean Gilyard quickly retracted the statement, appearing to recognize the impropriety and overreach of his assertion.

145.    Following the June 9th meeting, Plaintiff's parents sent a five-page written document outlining a timeline of all the events from May 24-25, as well as all of the relevant issues discussed during the approximately one-hour long meeting, in which Plaintiff's parents identified

in writing the original bases for Choate's decision to dismiss Plaintiff, as well as the multitudinous substantive and procedural flaws underlying the decision which are provided in greater detail below.

146.    At no time during the June 9th meeting, nor at any time, thereafter, did Dean Gilyard contest the representation made by Plaintiff's parents regarding the five reasons Dean Gilyard originally identified as the School's justification for its decision to dismiss Plaintiff.

147.    In fact, a week later, on Monday, June 16, 2025, Dean Gilyard transmitted an email to Plaintiff's parents in which he wrote: "Good morning all, I just wanted to share that I am still working on this request with folks here. I hope to be back in touch with you as soon as possible this week. I just wanted to reach out to let you know so that you were not just waiting. Best, Will." This was the last time Dean Gilyard communicated with the parents.

148.    Had the investigation adhered to the fair process guaranteed by Choate's policies, Dean Gilyard would have either reopened the matter or reduced the sanction against Plaintiff.

149.    Instead, Choate dug in its heels and, having already deprived Plaintiff of the opportunity to participate in the milestone of high school graduation and having inflicted reputational harm throughout the Choate community as the student who performed the most, and the most egregious acts, continued to abuse its authority, thereby compounding Plaintiff's emotional distress and public humiliation.

### g.  *The Elliott Email*

150.    On June 18, 2025, Jenny Elliott responded to the correspondence addressed to Dean Gilyard on June 9th but intentionally did not address any of the concerns raised or deficiencies highlighted by Plaintiff's parents. She simply stated she was upholding the Dean's decision based on "Jaidyn's actions" and tone-deafly wished Plaintiff well in achieving her GED.

151.    Plaintiff's parents responded by email dated June 18th, seeking further details on Choate's position given the lack of any formal letter or report delineating the investigatory steps taken, the evidentiary bases, and the rationale for the decision reached.

152.    In particular, Plaintiff's parents expressed concern about the fact that they had raised serious factual challenges to the alleged actions, the lack of clarity surrounding the decision, the arbitrary and capricious manner in which the investigation unfolded, the disparate treatment of Plaintiff as compared to other students involved in the relevant events, and requested a written explanation of the specific actions that formed the basis for the decision to uphold the recommended dismissal.

153.    Plaintiff's parents concluded their email by requesting that Choate: reconsider the decision through a restorative lens (as they seemed to have done with the other students), especially given Plaintiff's record of achievements over the prior four years, and consider the implications of the imposed discipline on Plaintiff's future. Plaintiff's parents also sought clarity as to whether Jenny Elliott was exercising her own discretion in upholding the Dean's original decision, or whether she was overriding what may have been a reconsideration by the Dean given the June 9th meeting and the related documentation provided.

154.    Nearly two weeks later, on July 1, 2025, Ms. Elliott responded with an itemized list of violations allegedly committed by Plaintiff.

155.    Ms. Elliott identified the following "behaviors that informed their decision to recommend dismissal", all of which were exaggerated, disingenuous, and/or taken out of context, as further described below:

      a.  Egregious intoxication/impairment- while any drug, alcohol, tobacco and/or nicotine use is a major school rule violation, use that prompts a trip to the hospital for medical care is regarded as an even more serious safety concern.

    b. Possession of alcohol paraphernalia, receipt of alcohol purchase, and bringing alcohol to a gathering of peers- creates safety concerns for the resident of that room, his/her/their neighbors, his/her/their peers and suggests repeated use that raises an additional safety concern about the student.

    c. Entering a faculty residence in the middle of the night without permission-when students enter any unauthorized space, they create safety concerns in terms of oversight and erode trust between students and faculty members. Faculty members and their families need to feel that students respect their privacy and home spaces; entering a faculty apartment in the middle of the night without permission is a significant breach of trust.

    d. Egregious and protracted lying- when students maintain untruths over a prolonged stretch of time to multiple sets of adults (on campus faculty members/Health Center staff members and off campus medical professionals in this case), our ability to care for students is compromised and trust is eroded. An attempt to construct an entirely different narrative, one that included an incredibly serious allegation of harm, was regarded as a serious personal integrity violation.

156. Ms. Elliott went on to state that each of these behaviors, in isolation, warranted a response that could include dismissal, and two of the behaviors could warrant a response of suspension or dismissal, and three or more "unquestionably invite a response of dismissal."

157. When Ms. Elliott wrote with unwarranted certainty that "each of these behaviors, in isolation, warranted a response that could include dismissal," that "two of the behaviors could warrant suspension or dismissal," and that "three or more unquestionably invite a response of dismissal," she exposed Choate's selective enforcement of its own Handbook policies while simultaneously revealing her personal bias.

158. Indeed, most of the students involved in the events of Saturday, May 24th through Sunday, May 25, 2025, committed at least three violations comparable to or more serious than those attributed to Plaintiff. Moreover, Plaintiff's actions on the evening of May 24th were not done in isolation as Ms. Elliott suggests.

159. The indisputable violations of the other students include the following: drug use; unauthorized absence from campus; repeated use of day students' vehicles to travel to locations other than campus or home without form dean approval (a potential personal integrity violation

under the Handbook); multiple boarding students riding in vehicles driven by multiple day students; purchasing and bringing alcohol to the party; the collective failure of those present at E.S.'s house (and those who had left the house but still participated in the decision to return Plaintiff to campus) to seek adult assistance when aware that a student may have been impaired or in danger due to drug or alcohol use; driving Plaintiff back to campus; failure to seek adult assistance upon the return to campus; and knowingly providing false accounts of their own involvement, including misrepresenting Plaintiff's role in distributing alcohol which began during her hospitalization and when she was unable to defend herself.

160.    Ms. Elliott attempts to magnify Plaintiff's culpability while ignoring the facts. Multiple students committed multiple infractions (certainly three or more) and were not dismissed. In fact, they were allowed to remain on campus, attend graduation, and receive their diplomas – all in contradiction to the Handbook's rules governing suspensions. Choate's weak disciplinary measures underscored its determination to treat the other students favorably by treating these egregious violations as inconsequential.

161.    This response not only trivialized their alleged misconduct but also served to amplify the allegations against Plaintiff (the one who "got caught"), reinforcing Choate's pattern of discrimination towards Plaintiff and Choate's selective enforcement.

162.    Ms. Elliott emphasized that "[a]t the core of our system is the prioritization of keeping our community safe and maintaining the trust necessary to maintain strong sense of community- we view behaviors that jeopardize the safety and trust of our community the most seriously."

163.    Ms. Elliott further offered her perspective on the events, again citing to the matter as a safety issue, and noting that on the night at issue, Plaintiff had been given permission to be

off campus for the night. Thus, as her House Mentor (i.e., Ms. Koleva) was not expecting Plaintiff to be on campus, in the event there had been some emergency that evening, the House Mentor would not have known to account for Plaintiff.

164.  What Ms. Elliott failed to address in her pretextual allusion to safety, was the unarguable fact that the decision to return Plaintiff to campus on the evening of May 24th was not made by Plaintiff, who was unaware of her surroundings, but by several other students, who were likely under the influence of alcohol and drugs, which placed Plaintiff at great risk for **her** safety. Ms. Koleva's inability to account for Plaintiff should not have been attributed to Plaintiff, but rather to the students who took it upon themselves to return Plaintiff to the dorm without notifying Ms. Koleva. Further to this point, the students who lived in the dorm and were present when Plaintiff was returned bear equal responsibility. Instead, Ms. Elliott chose to blame Plaintiff, the victim, who was without agency.

165.  However, none of the students were seriously disciplined for their actions, despite Ms. Elliott's purposed "safety concerns" and despite the very clear and direct violation of the Handbook's policy requiring students to "take immediate action to get help from adults when they have knowledge that another student may be impaired and/or in danger because of the use of drugs, alcohol…"

166.  Ms. Elliott's reasoning for upholding the recommended dismissal was problematic for several additional reasons.

167.  First, with respect to the claim of egregious intoxication/impairment, the statement included in Ms. Elliott's email differs substantially from what the Plaintiff and her family were initially told on May 28, 2025, by Dean Gilyard. Namely, the reason she was being dismissed was because her "alcohol level was high."

168.    Choate likely abandoned this argument once the Plaintiff's parents pointed out that the School possessed neither evidence nor records of Plaintiff's blood alcohol level from that evening, nor did it have any comparative data regarding the alcohol levels of the other students.

169.    Instead, in a striking display of bad faith and deception, Ms. Elliott asserted that Plaintiff's hospital visit was indicative of her intoxication level and on that basis alone was sufficient to deem this a "safety concern."

170.    Ironically, despite its professed concern for safety, Choate failed in its duty to disclose relevant information to ensure Plaintiff's safety, when nurse practitioner Anagnost failed to advise Plaintiff of the side effects of fluconazole before prescribing it to her.[9]

171.    This omission violated the required standard of care, deprived Plaintiff of the opportunity to make an informed decision regarding her conduct while under the School's care (had she known about the side effects or the potentially dangerous interaction with alcohol, she may have forgone the drug altogether and would have certainly refrained from consuming any alcohol on the night of May 24th and thus, would not have been subjected to dismissal days prior to graduation), and breached Choate's duty to prevent foreseeable and preventable harm to its students. *See Munn v. Hotchkiss School*, 326 Conn. 540, 551–52, 165 A.3d 1167, 1176 (2017).

172.    Choate's health center again failed to ensure a reasonable duty of care to its students, Plaintiff in particular, on the morning of May 25, 2025, when it administered a faulty breathalyzer test to Plaintiff that showed a potentially fatal blood alcohol level of .4. The nurse with whom Plaintiff's father spoke admitted the test was not working properly and after multiple

---

[9] It is noteworthy that Plaintiff did not recall much of the evening after 10:30/11:00 p.m. She knew she had attended a party and acknowledged some drinking but not to a level that she should have become as incapacitated as she was. Plaintiff contends that this rapid progression to intoxication was due to the combination of alcohol and fluconazole.

tests, was providing inconsistent results. These faulty results caused undue stress to Plaintiff and her family and resulted in Plaintiff's transfer to the Yale New Haven Children's Hospital. For some unknown reason, Choate's health center also failed to take a urine sample, an alternative test identified in the Handbook, constituting another violation of the School's own protocols.

173.    In a case of circuitous reasoning and arbitrary decision making, despite the fact the decision to transport Plaintiff to New Haven was based on the fatal blood alcohol level reported by the faulty breathalyzer test, Ms. Elliott subsequently used the fact of this transport and Plaintiff's admission to the hospital as a retroactive justification for its decision to dismiss her.

174.    In other words, rather than acknowledging its own role in necessitating the hospitalization, Choate repurposed this precautionary measure into a disciplinary weapon, effectively punishing Plaintiff for circumstances rooted in the institution's failure.

175.    Second, Choate seeks to impose disciplinary sanctions based on alleged possession of "alcohol paraphernalia," which is a term referenced in the Handbook but left totally undefined. In the absence of any operative definition, Defendants have retroactively construed empty alcohol bottles as falling within the scope of "alcohol paraphernalia," thereby enforcing an ambiguous policy in an arbitrary and unforeseeable manner. While the Handbook clearly prohibits possession of "alcohol paraphernalia," it fails to provide examples as it does for drug paraphernalia. Defendants' post hoc interpretation—treating empty alcohol bottles as paraphernalia—constitutes an impermissible expansion of policy language, depriving Plaintiff of fair notice and rendering the disciplinary charge procedurally defective.

176.    The selective enforcement of Choate's policies further harmed Plaintiff alone, when Choate utilized the improper search of her room to locate "paraphernalia"- a receipt for the purchase of alcohol on May 23, which did not include Plaintiff's name. There was no evidence

that the bottle purchased on May 23rd was the same bottle consumed on May 24th at the party. In fact, the evidence gathered by Plaintiff's parents disputed that the bottle purchased Friday evening was the same product consumed at the party on Saturday -- a fact that Choate ignored.

177.    Choate's decision to single out Plaintiff's room for a search while deliberately choosing not to conduct contemporaneous searches of the other involved students' rooms and lockers, constitutes a clear departure from equitable enforcement. That this search occurred in contradiction to the Handbook due to Plaintiff being hospitalized and the absence of exigent circumstances, further illustrates Dean Gilyard's and the institution's targeted and unjust approach.

178.    Choate accused Plaintiff of "bringing alcohol to the party" but failed to provide any evidence that Plaintiff brought alcohol to the party. Dean Gilyard admitted that the dean's group assumed and failed to substantiate that the Pink Whitney described on the receipt was the same Pink Whitney brought to the party. Additionally, had the School conducted a proper and thorough investigation, Choate easily could have verified that at least five girls were in a car, driven by someone other than Plaintiff, that brought alcohol to the party.

179.    A text message sent by one of the attendees at the gathering wrote: "by the time *all* the girls pulled up with the alcohol, most people were drinking…" confirming that several people arrived with alcohol, and some even before Plaintiff arrived, and it was not the Plaintiff alone who brought alcohol to the party as Ms. Elliott's email suggested.

180.    Furthermore, Plaintiff's parents had provided Choate evidence that, had the School pursued it, could have confirmed that Smith purchased the alcohol on the evening of May 24th. Choate failed to obtain video footage from the liquor store, did not request a copy of Smith's purchase history on her phone, and by Dean Gilyard's own admission, knew absolutely nothing

about Hometown Wine & Liquors, neither did he know what type of alcohol was purchased and brought to the party.

181.    Evidently, rather than reconsider whether Dean Gilyard's conclusions, based on an investigation that lacked even a semblance of a meaningful or fair process, Ms. Elliott conveniently viewed Plaintiff's conduct as isolated behavior beyond the level of others involved and treated her as if she were solely responsible in order to create justifications for the dismissal decision.

182.    The number of blunders, compounded by procedural inequities, transcended mere negligence; they constituted a targeted exercise of institutional discretion aimed at isolating Plaintiff, obscuring the broader context of her conduct, and retroactively manufacturing justification for a predetermined dismissal.

183.    While aggressively pursuing and creating various allegations against Plaintiff, Choate turned a blind eye with respect to students' drug use on the evening of May 24th.

184.    The Handbook clearly provides as follows with respect to student drug use:

> "[i]n the event the test results are positive for drugs, for which the student's use is not fully in accordance with a physician's prescription registered with the Health Center for that student, the student will be dismissed regardless of whether the violation occurred on- or off-campus or during the academic year or break. If the test results are positive for alcohol but not drugs, the student will at a minimum be placed on Probation regardless of whether the violation occurred on- or off-campus or during the academic year or break, and the student will also be held to the School's No- Use Policy (see p. 18) for the duration of their period of Probation."

185.    Dean Gilyard confirmed during the meeting of June 9th that the investigation had revealed there was drug use at E.S.'s house. Yet none of the students who engaged in drug use were dismissed, contrary to the explicit provision in the Handbook. In fact, many of the students were not tested at all. Furthermore, during the June 9th meeting, when Plaintiff's parents raised this inconsistency, Dean Gilyard responded casually, stating: "We no longer do one and you're done." Taken aback, Plaintiff's mother replied, "[b]ut that's not in your policy," to which Dean Gilyard

merely shrugged. The contradiction was incredulously stark: for Plaintiff, Choate's discretion under its policy was rigidly enforced; for others, whose conduct clearly breached its operative standards, the policy was abandoned.

186.    In sharp contrast, rather than impose probation as allowed under the Handbook related to alcohol use, and given Plaintiff's lack of disciplinary history, and the completion of all academic requirements, and her mental health struggles, and the health center's omission of material information accompanying the administration of a drug that takes several days to leave the body, and the faulty breathalyzer, and her anticipated graduation in a matter of days, Choate issued the incredibly harsh sanction of dismissal.

187.    Hypocritically, Choate and Ms. Elliott cited student safety to justify Plaintiff's dismissal, even as they flagrantly violated Choate's own drug-use policies by abandoning required testing protocols, thereby endangering the very students they claimed to keep safe and protect.

188.    Third, the alleged violation concerning Plaintiff entering a faculty residence in the middle of the night without permission was mischaracterized and taken out of context, to hold Plaintiff responsible for additional charges.

189.    Of particular significance, this alleged "violation" was never raised during the initial meeting on May 28, 2025, with Dean Gilyard. It was only later, on June 9th, after the dismissal decision had been made and upheld that Choate introduced this charge, to retroactively justify its disproportionately severe decision.

190.    Even if the allegation had been brought up during the initial meeting, it could not have withstood scrutiny for two reasons.

191.    One, the Handbook does not identify faculty residences as unauthorized spaces. Unauthorized spaces are defined by the Handbook as "construction areas, storage spaces, utility

rooms, vacant apartments, faculty offices, school facilities outside operating hours…" Faculty residences are indisputably not identified.

192.    Two, Plaintiff did not knowingly or intentionally enter Ms. Koleva's residence. At the time, she was visibly disoriented due to incapacitation.

193.    When she wandered into Ms. Koleva's residence, she believed that she was still in E.S.'s home, the last place that she recalled being.

194.    This unintentional and involuntary action should not have been deemed a policy violation.

195.    Finally, the allegation of egregious and protracted lying arose from an evolving narrative in which Choate continued to reframe the grounds for Plaintiff's disciplinary outcome.

196.    Initially, Dean Gilyard conveyed that Plaintiff's discipline was justified because she "lied while sober".

197.    After meeting with Plaintiff's parents on June 9th to discuss the matter, Dean Gilyard recognized that this allegation could not be sustained. Dean Gilyard's original statement that "Plaintiff's alcohol level was high," combined with Ms. Elliott's email in which she states: ",,,, use that prompts a trip to the hospital for medical care is regarded as an even more serious safety concern," demonstrate Choate's belief that Plaintiff was intoxicated on the morning of May 25th. Therefore, under Choate's expressed reasoning, Plaintiff would not have been sober in the morning, but at some point following Plaintiff's hospitalization. The only time Plaintiff engaged with Choate in the context of the investigation after leaving the hospital was during her meeting with Ms. Homan at or about 4:30 in the afternoon of May 25th. There was no evidence that Plaintiff lied about anything during that interview. Hence, Plaintiff did not "lie while sober," forcing Choate to abandon that accusation.

198.    Unable to rely on the conclusion that Plaintiff lied while sober, Choate shifted rationales again and began to target Plaintiff's statements while in the hospital – a time that Choate, by its own admissions, believed Plaintiff was compromised.

199.    In fact, Plaintiff's conduct in the hospital was no different from her peers, most if not all of whom initially created a false narrative about the events of the night of May 24th, as acknowledged by Dean Dennehy to her parents in the hospital, yet Choate was seemingly determined to differentiate Plaintiff's behavior.

200.    As such, the School's rationale shifted from Plaintiff "lied while sober" into a sweeping claim by Ms. Elliott that Plaintiff's actions rose to a level of violating the personal integrity provisions of the Handbook by lying over an extended period of time. This was an exaggerated and unsupported narrative created by Ms. Elliot to justify the unwarranted sanction imposed.

201.    Despite Plaintiff's parents' requests for details, on June 18th, Ms. Elliott's July 1st generalizations lacked any facts supporting her allegation regarding protracted lying.

202.    To the degree that Ms. Elliott's accusation is referencing the collective lie of the students, Ms. Elliott conveniently ignores the fact that the story concerning "Q" bringing Plaintiff back to campus only benefited the students who were trying to distance themselves from their actions of the night before. In other words, "if Plaintiff was drinking and returned to campus, it happened with Q, not us because she left us at 10:30."

203.    As for the issue with the bottles, that narrative collapsed within 30 seconds when Plaintiff was questioned by her father. Elliott's assertion of "protracted lying" lacks any factual basis and is contradicted by the available evidence.

204.    In actuality, Ms. Elliott selectively disregarded the numerous falsehoods knowingly told by other students, who, unlike Plaintiff, recalled the events of that night in full, had time to construct their individual and collective narratives, and were therefore more likely culpable under the School's supposed personal integrity standard.

205.    Instead, Ms. Elliott chose to amplify and distort Plaintiff's actions, relying on exaggerated truths to brand Plaintiff a liar. By contorting Plaintiff's actions and statements to fit Ms. Elliott's predetermined narrative, Ms. Elliott engaged in a form of misrepresentation that resembles the very conduct of which she accused Plaintiff.

206.    Ms. Elliott concluded her July 1st email by noting she considered the matter closed, depriving Plaintiff of any further opportunity to rectify the severe and ongoing harm caused by the institution she had called home for the prior four years.

## PLAINTIFF'S DAMAGES

207.    Contrary to Choate's pronouncement of integrity, respect, and character as the central and guiding elements of its community, Choate violated these principles at every step of the way.

208.    Choate forced Plaintiff to withdraw from the School just days prior to her graduation, when it presented her with the alternative of dismissal.

209.    This forced withdrawal, effectuated in the final days of her high school career, along with the refusal to issue Plaintiff her diploma has already caused, and will continue to cause, severe and ongoing harm to her future educational and career opportunities, her reputation, and her mental health.

210.    As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain damages related to her educational opportunities.

211.    As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain reputational harm.

212.    As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain damages related to her future employment opportunities.

213.    As a result of Defendant's actions, Plaintiff has sustained and will continue to sustain damages related to emotional and psychological distress.

214.    As a result of the foregoing, Plaintiff seeks relief for the damages caused by Defendants' actions and inactions, all of which will permanently alter the trajectory of Plaintiff's life.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
### Breach of Contract
### (Against Choate)

215.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

216.    Plaintiff matriculated at Choate in the fall of 2021 and paid all required tuition and fees for each year of attendance.

217.    Plaintiff did so in reliance on the understanding and with the reasonable expectation that the School would implement and enforce its policies and procedures as set forth in its official publications, including the Handbook.

218.    It is well accepted in Connecticut that "the basic legal relation between a student and a private university or college is contractual in nature" and "the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and

the educational institution." *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 667 (D. Conn. 2019); *Bass ex rel. Bass v. Miss Porter's Sch.,* 738 F. Supp. 2d 307, 321 (D. Conn. 2010).

219.    Thus, an express contract, or alternatively, a contract implied in law or in fact was formed between Plaintiff and Choate.

220.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreements with Plaintiff. A non-exhaustive list of Defendants' uncontroverted violations follows.

221.    First, the Handbook provides at page 19: "[i]t is the Dean of Students' duty to ensure that students are given fair process."

222.    Notwithstanding, the process afforded to Plaintiff was anything but fair. From the outset, Plaintiff was isolated from the other involved students and held to a higher standard when she was targeted by Defendants and ultimately, subjected to a forced withdrawal.

223.    After conducting a superficial investigation that included little more than speaking with students (all of whom were undoubtedly in self-preservation mode), and searching Plaintiff's room, Dean Gilyard rushed to issue his decision before Plaintiff could graduate and earn her diploma.

224.    During the meeting of May 28th, Dean Gilyard notified Plaintiff's parents that she would be required to accept a dismissal or withdraw. This decision was made unilaterally, without providing Plaintiff notice of the charges against her, or the alleged policy violations implicated by Plaintiff, without diligent effort to gather relevant evidence, without a hearing, without affording Plaintiff an opportunity to contest the charges against her, without a disclosure of the evidence obtained, and without an opportunity to challenge the decision with an appeal.

225.    When Plaintiff's parents met with Dean Gilyard and Dean Homan on June 9, 2025, and pointed out the various factual errors relied upon, the number of unsubstantiated facts, the various procedural errors, inconsistencies in the students' reports, and overarching concerns related to Choate's handling of the matter, Dean Gilyard introduced for the first time a claim that Plaintiff was found on the upper level of her dorm where Ms. Koleva lived, which was purportedly a violation of school policies.

226.    Yet, this allegation was raised almost two weeks after the fact and therefore had not been brought up in any previous meeting and notably, had not been raised before Plaintiff was faced with the ultimatum of dismissal or withdrawal.

227.    By failing to raise all relevant allegations at the time of the original proceeding, the school breached its obligation to conduct a fair process, as described in its own policies.

228.    The addition of this new and previously undisclosed claim further demonstrated the lack of fairness and equity in the process.

229.    The decision was subsequently upheld by Ms. Elliott, who relied on post-hoc rationalizations, supplemental charges, and disingenuous explanations to support Dean Gilyard's decision.

230.    The School's decision to ignore its flawed process was a dramatic departure from its representation as an elite institution that values equity, as well as a breach of its own policies.

231.    Choate further violated its Handbook when it disclosed to another student's parents information about whether Plaintiff had permission to stay over at E.S.'s house on the evening of May 24th.

232.    The Handbook provides "[s]tudents and adults alike have an obligation to protect confidential information shared by others unless that information raises concerns that someone's physical or mental health may be at risk." (Handbook, p. 5)

233.    On May 27, 2025, Plaintiff's parents received a call from a parent who revealed that the parent was told that Plaintiff did not belong at E.S.'s house that night, because she was not properly cleared to be off campus.

234.    As this was confidential information related to a form in Plaintiff's student record that hadn't been updated, this information should not have been disclosed to the parent of another student.

235.    Upon information and belief, this disclosure was made by Dean Aliya Cox, who was an investigator on the matter and also served as a form dean.

236.    If Dean Gilyard was not previously aware of this incident, he became aware on June 9th, when Plaintiff's parents informed him directly. They cited it as a shocking example of how the School's actions had compounded harm during an active investigation. This false disclosure had created an environment of distrust among the parents while inflicting further reputational harm to Plaintiff.

237.    Plaintiff's discovery of this betrayal was deeply personal and painful. A form dean—one of only two investigators with direct influence over Plaintiff's future—had engaged in juvenile, unprofessional chatter by carelessly sharing confidential misinformation. This wasn't just indiscretion; it was institutional misconduct. Faced with this revelation, Dean Gilyard remained silent—a response that reflected neither empathy nor accountability.

238.    Upon information and belief, no corrective action has been taken toward Ms. Cox, reinforcing the perception that the institution holds some students to strict standards under the Handbook, while exempting its own employees from meaningful accountability.

239.    This violation of Plaintiff's privacy also constituted a direct violation of Choate's Handbook and is definitively demonstrative of the bias embedded in the investigatory process.

240.    Further, the Handbook states with respect to suspension of a sixth former (high school senior): "[i]f a sixth former is suspended on or after the last Monday of classes or is serving a long Suspension on the day of graduation, the student will not be allowed to participate in the graduation ceremony and will be required to leave campus after their last academic commitment. The diploma will be mailed home." What's more, on March 5, 2025, Dean Gilyard transmitted an email to sixth formers which, in relevant part, provided a specific reminder of this Handbook provision.

241.    In violation of this provision, several students who attended the gathering on May 24th, and who received suspensions on or after May 27, 2025 (i.e. during the timeframe identified in Dean Gilyard's March 5th email) were nonetheless permitted to attend graduation and remain on campus. They also received their diplomas before leaving for their homes.

242.    Finally, the Handbook indicates that students are expected "to take immediate action to get help from adults when they have knowledge that another student may be impaired and/or in danger because of the use of drugs, alcohol…"

243.    When Plaintiff became incapacitated on the night of May 24th, the other students failed to take any steps to seek help from an adult, despite knowing that she was impaired and could be in danger.

244.    Instead, they drove her back to her residence hall (likely while under the influence of drugs and alcohol, placing her in even further danger) and left her there, in her room, alone.

245.    Upon information and belief, these students were not disciplined based on the magnitude of their actions given Ms. Elliott's alleged concerns around safety, establishing another failure on the part of Choate and a violation of its policies. With the exception of missing a few days of pre-graduation events, they were able to stay on campus, attend the final days of classes and properly say goodbye to their teachers and friends, and attend graduation. They were, in essence, barely disciplined at all.

246.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

247.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against Choate)

248.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

249.    In Connecticut, it is well accepted that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Courteau v. Tchrs. Ins. Co.,* 243 F. Supp. 3d 215, 219 (D. Conn. 2017).

250.    The explicit contract between Plaintiff and Choate, the Student Handbook, included an obligation to carry out the provisions of the contract and the attendant duties in good faith.

251.    Choate violated the covenant of good faith and fair dealing through its actions which deprived Plaintiff of the benefits of the agreement to which she was entitled.

252.    First, Choate's decision to supplement the disciplinary record with additional and escalated charges, after issuing the initial decision and forcing Plaintiff to choose between withdrawal and dismissal was an act of bad faith and robbed Plaintiff of the fair process required by the policies.

253.    Second, Ms. Elliott relied upon the fact of Plaintiff's hospital visit to substantiate the charge of egregious intoxication/impairment, despite that the decision to transport Plaintiff to Yale New Haven Children's Hospital was based on the fatal blood alcohol level reported by the faulty breathalyzer test administered by a nurse practitioner at the student health center.

254.    Nonetheless, in an act of bad faith, Choate subsequently used the fact of this transport and Plaintiff's admission to the hospital as a retroactive justification for its decision to dismiss her.

255.    Third, when upholding Dean Gilyard's decision, Ms. Elliott erroneously accused Plaintiff of entering an "unauthorized space"—a designation not supported by the Handbook's definitions. Even assuming arguendo that space was unauthorized, Plaintiff did not knowingly or intentionally enter it, rendering the accusation both factually and legally baseless.

256.    Compounding this error, Ms. Elliott gratuitously invoked alleged safety concerns surrounding Plaintiff's return to campus as an additional rationale for the severe penalty. This justification was not only procedurally irrelevant (having played no role in the original disciplinary determination according to Ms. Elliott), but also demonstrably false. Hence, Ms. Elliott's remarks

were devoid of institutional purpose. Instead, her statements amounted to a self-serving and gratuitous effort to further demean Plaintiff personally, reflecting a troubling departure from sound educational leadership principles, not to mention fairness, impartiality, and basic respect for student dignity.

257.    Significantly, Ms. Elliott deliberately and irresponsibly ignored that the decision to return Plaintiff to campus on the evening of May 24th was not made by Plaintiff, who was disoriented and unaware of her surroundings, but by several other students, who were likely under the influence of alcohol and drugs, which placed Plaintiff at great risk for her safety—a risk that could have ended in a fatality.

258.    And yet, with the exception of E.S., none of the students were disciplined commensurate to the gravity of their unsafe actions, despite Ms. Elliott's grave concern for safety and the direct violation of the Handbook's policy requiring students to "take immediate action to get help from adults when they have knowledge that another student may be impaired and/or in danger because of the use of drugs, alcohol…"

259.    Each of the foregoing, in addition to the direct violations of Choate's policies amount to violations of the covenant of good faith and fair dealing.

260.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

261.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

262.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

263.    "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury...." *McCarroll v. Town of E. Haven,* 180 Conn. App. 515, 522, 183 A.3d 662, 667 (2018).

264.    The courts in Connecticut recognize that every school has a "common-sense duty to protect the health and safety of students in its care" under Connecticut General Statutes § 10–220. *See Munn v. Hotchkiss Sch.,* 24 F. Supp. 3d 155, 170 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018).

265.    With respect to boarding schools in particular, this duty of care is heightened, given administrators and teachers "stand in loco parentis toward a pupil" in matters of discipline and security and "accept responsibility for students' well-being." *Munn v. Hotchkiss Sch.,* 24 F. Supp. 3d 155, 170 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018); *Brenes v. McSwyny*, No. UWY-CV-19-6049725-S, 2023 WL 2385804, at *4 (Conn. Super. Ct. Mar. 1, 2023) ("there is a special relationship between a private boarding school and its students inasmuch as a boarding school exercises a form of custody or control over its students.")

266.    Choate thus owed Plaintiff a duty of care, as one of its boarding students, and committed egregious violations of that duty.

267.    First, on May 23, 2025, Plaintiff had sought treatment at Choate's Pratt Health Center for what was ultimately diagnosed as a yeast infection by Nurse Practitioner Anagnost.

268.    Ms. Anagnost prescribed Plaintiff fluconazole, an antifungal medication, yet failed to inform Plaintiff of the warnings or potential side effects of the medication. Particularly, consuming alcohol while on fluconazole can compound the effects of each substance and significantly increase the risk of liver injury.

269.    As a consequence of Choate's failure in this regard, Plaintiff was not aware that her consumption of alcohol while on fluconazole on the evening of May 24th was potentially dangerous, or even lethal.

270.    This omission violated the required standard of care, deprived Plaintiff of the opportunity to make an informed decision regarding her conduct while under the School's care, and breached Choate's duty to prevent foreseeable and preventable harm to its students. *Munn v. Hotchkiss School*, 326 Conn. 540, 551–52, 165 A.3d 1167, 1176 (2017).

271.    Second, Choate's health center again failed to ensure a reasonable duty of care to Plaintiff on the morning of May 25, 2025, when it administered a faulty breathalyzer test that showed a potentially fatal blood alcohol level of .4, more than four times the legal limit.

272.    The nurse with whom Plaintiff's father spoke admitted the test was not working properly and after multiple tests, was providing inconsistent results. These faulty results led to Plaintiff's transfer to the Yale New Haven Children's Hospital. It is unclear why, despite the defective breathalyzer results, the health center failed to take a urine sample, an alternative test identified in the Handbook.

273.    This further violation of Choate's duty to care for its students constituted another act of negligence, causing undue stress and emotional distress to Plaintiff and her parents.

274.    Third, Dean Gilyard and Ms. Elliott were negligent in their application of the Handbook's policies with respect to investigating the relevant events and disciplining Plaintiff.

275.    Dean Gilyard imposed an ultimatum, requiring Plaintiff to either withdraw or accept a dismissal, all within the span of a few hours.

276.    This dismissal decision was made hastily and in response to a flawed, biased, and perfunctory investigation in which Plaintiff was targeted by administrators of Choate, because she was the one who got "caught."

277.    Dean Gilyard violated his obligation to ensure a fair process and thus violated his duty of care owed to Plaintiff.

278.    Ms. Elliott's actions fared no better, as she relied on post-hoc rationalizations, supplemental charges, and disingenuous explanations to support Gilyard's baseless decision, which will affect Plaintiff's future educational and career opportunities immensely.

279.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

280.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### Lack of Informed Consent
#### (Against All Defendants)

281.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

282.    The essential elements of a cause of action for Lack of Informed Consent include: (1) a breach (2) a duty by the defendant, (3) a causal connection between the breach and (4) harm to the plaintiff. *Fajardo v. Boston Scientific Corporation,* 341 Conn. 535 (2021).

283.    Connecticut law applies the "lay standard of disclosure" to informed consent cases where the focus is on the information a reasonable patient would find material in deciding whether to proceed with a medical procedure, including "risks and hazards" or "benefits" of the procedure that a reasonable patient in the patient's position would find important." *Logan v. Greenwich Hosp. Ass'n,* 191 Conn. 282, 292, 465 A.2d 294, 300–01 (1983); *Torres v. Carrese,* 149 Conn. App. 596 619, 90 A.3d 256, 271 (2014).

284.    Moreover, it is well established that "treatment of a condition by the prescribing of medication is no less a form of treatment than surgery for a condition." *Wood v. Rutherford, 187 Conn. App.* 61, 86 201 A.3d 1025,1042 (2019).

285.    As noted above, Ms. Anagnost prescribed Plaintiff fluconazole, an antifungal medication, yet failed to inform Plaintiff of the warnings or potential side effects of the medication which include, but are not limited to: seizures, dizziness, paresthesia, headaches, abdominal pain, diarrhea, nausea, and vomiting. Such material information at the very least would have given Plaintiff material information that would have allowed her to decide whether to take the medication. What's more, had Plaintiff known about these potential side effects, even if she decided to take the medication, it's reasonable to assume that she would have avoided the intake of any alcohol until the medication left her system, which was additional information not shared by the health center.

286.    Choate's failure in this regard was egregious and deprived Plaintiff of the opportunity to make an informed decision regarding her conduct while under the School's care, and breached Choate's duty to prevent foreseeable and preventable harm to Plaintiff. *Munn v. Hotchkiss School*, 326 Conn. 540, 551-52, 165 A.3d 1167, 1176 (2017).

287.    Dean Gilyard's decision to actively pursue Plaintiff's dismissal, coupled with Ms. Elliot's knowing affirmation of that decision, despite their shared awareness of these material facts, constituted a flagrant abuse of power and discretion.

288.    Their coordinated refusal to acknowledge or act upon these facts demonstrated not only a willful disregard for Plaintiff's emotional and physical well-being, but also a profound betrayal of the duty entrusted to them by Choate to protect, support, and advocate for the students in their care, particularly Plaintiff.

289.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

290.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Tortious Interference with Contract
### (Against Gilyard, Elliott and Cox)

291.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

292.    To establish a claim for intentional interference with contractual relations in Connecticut, a plaintiff must establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct. *See Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d 304, 311–12 (2007).

293.    At all relevant times, Plaintiff had a contractual relationship with Choate, the terms of which included the provisions in the 2024-2025 Handbook.

294.    As administrators of the School, Dean Gilyard, Ms. Elliott, and Dean Cox were aware of Plaintiff's contractual relationship with Choate.

295.    Dean Gilyard, Ms. Elliott, and Dean Cox, through their actions in investigating the relevant events and subsequently disciplining Plaintiff, intentionally interfered with Plaintiff's relationship with Choate.

296.    By way of example and not limitation, and as described further, *supra:*

- Gilyard interfered with Plaintiff's right under the Handbook to be given a fair process when he imposed an ultimatum of dismissal or withdrawal, without providing Plaintiff notice of the specific charges against her, without making a diligent effort to gather relevant evidence, without a hearing, without affording Plaintiff an opportunity to contest the charges against her once known on May 28th, without a disclosure of the evidence obtained, without an opportunity to challenge the decision through an appeal process, and engaging in a pattern of adding post hoc rationalizations to justify his decision.

- Ms. Elliott interfered with Plaintiff's right to a fair process as guaranteed by the Handbook when she supported Dean Gilyard's tortious actions noted above, revised the grounds for the intoxication charge, mischaracterized and exaggerated the other alleged conduct at issue, and introduced a brand-new charge after Plaintiff had already submitted her withdrawal form to retroactively justify the disproportionately severe and discriminatory decision.

- Dean Cox interfered with Plaintiff's right to confidentiality of her own student records, when she disclosed to another student's parents, information about whether Plaintiff had permission to stay over E.S.'s house on the evening of May 24th. Dean Cox's irresponsible, unprofessional, and egregious violation caused Plaintiff further reputational damage within the Choate community, during the investigation, and after, exacerbating the harm to Plaintiff.

297.    Dean Gilyard and Ms. Elliott's and Ms. Cox's tortious conduct proximately caused Plaintiff to suffer substantial injury when they required her to withdraw or accept a dismissal from the School, mere days prior to her expected graduation date.

298.    This decision will undoubtedly have lifelong ramifications with respect to Plaintiff's future educational and career opportunities.

299.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

300.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

301.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

302.    To prevail on a claim for negligent infliction of emotional distress in Connecticut, a plaintiff must show that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Noffsinger v. SSC Niantic Operating Co., LLC*, 338 F. Supp. 3d 78, 87 (D. Conn. 2018).

303.    Defendants' actions in conducting a procedurally defunct investigative process created an unreasonable risk of causing Plaintiff emotional distress.

304.    Defendant's actions included:

- targeting Plaintiff as the sole party responsible for any alleged wrongdoing during the relevant events, pressuring her to decide between withdrawing from Choate or being subjected to dismissal.

- creating a new charge after the discipline was put into effect in order to retroactively justify the excessively disproportionate sanction imposed;

54

- revising the grounds for another charge upon learning that the charge could not be substantiated;

- failing to conduct an investigation that contained even a semblance of fairness or thoroughness;

- reaching an erroneous decision without providing Plaintiff specific notice of the charges against her, without diligent effort to gather relevant evidence, without a hearing, without affording Plaintiff an opportunity to contest the charges against her, without a disclosure of the evidence obtained, and without an opportunity to challenge the decision with an appeal; and

- forcing her to contact New York University, thereby compounding reputational harm at her new institution and placing her academic prospects in serious jeopardy.

305.    Based on the foregoing, Plaintiff's mental anguish and emotional distress in response to the actions and omissions of the Defendants were foreseeable.

306.    Plaintiff's mental anguish and emotional distress were, and are, severe enough that they might result in bodily harm or illness. Due to the stress endured by Plaintiff has: suffered panic attacks, experienced a loss of appetite, experienced bouts of depression due to the trauma and shame of being banned from campus while others remained, experienced emotional isolation due to the distancing of some of her friends and their parents with whom she had good relationships, suffered the indignity and the fear of notifying New York University of her forced withdrawal, suffered the indignity of having to call family members to notify them to cancel their travel plans for the graduation, and she was forced to begin studying for the GED under the duress of possibly losing her admitted status to New York University.

307.    The Defendants' conduct did in fact cause Plaintiff severe and substantial emotional distress.

308.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against Choate)

309.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

310.    A plaintiff seeking recovery for unjust enrichment must prove "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 573, 898 A.2d 178, 190 (2006).

311.    Defendants benefited from the receipt of Plaintiff's tuition payments, totaling about $270,390.00 over four (4) years.

312.    Choate leveraged Plaintiff's personality and leadership skills as she supported Choate's recruitment efforts in her role as a Gold Key Tour Guide, providing campus tours and served as a contact for prospective students, answering questions and helping them navigate Choate. She was also a Pathways Student Mentor. As such she guided and supported new students of color during their transition into Choate, which included fall orientation and weekly check-ins throughout the year. Further, she had a formal role on the Student Committee on Programming and Engagement. In that capacity, she planned, promoted, and created inclusive events to enhance student life, supported engagement and club activities. She was also an Eco Rep. In that role, she ensured proper recycling, composting, and energy conservation practices in her dorm, while acting as a resource for the dorm's conservation proctors. She represented Choate during the Model UN held at Yale University. Additionally, she represented Choate and achieved the Mandarin Poetry Recitation Silver Award in a high school contest sponsored by the Connecticut Council of Language Teachers.

313.    Plaintiff in turn did not receive the benefit of the bargain when she was forced to withdraw from Choate in the final days of her final year.

314.    Though Plaintiff completed all required courses and credits to complete her education at Choate, she was nonetheless deprived of the right to graduate with her class, earn her diploma, and retain her good name and reputation, all to her detriment.

315.    Choate nonetheless retained the tuition payments made in furtherance of Plaintiff's expected completion of her degree.

316.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Defamation**
**(Against All Defendants)**

317.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

318.    The courts of Connecticut recognize an action for defamation when: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627 (2009).

319.    A defamatory statement is defined as "a communication that tends to harm the reputation of another as to lower [her] in the estimation of the community." *Id.*

320.    Dean Gilyard, Ms. Elliott's and Ms. Cox's tortious conduct in conducting an unfair and predetermined investigation proximately caused Plaintiff to suffer substantial injury when they

required her to withdraw or accept a dismissal from the School, mere days prior to her expected graduation date.

321.    By depriving Plaintiff of the opportunity to celebrate the milestone of her high school graduation with her peers, Defendants impliedly defamed Plaintiff and damaged her reputation amongst the Choate community.

322.    Additionally, as described *supra*, upon Plaintiff's execution of the withdrawal form, Choate informed Plaintiff that her final transcript would now bear a notation of "Withdrawn Under Disciplinary Investigation" and that the transcript would be submitted to New York University.

323.    Choate forced Plaintiff to contact New York University about the fact of her withdrawal, thereby compounding reputational harm at her new institution and placing her academic prospects in serious jeopardy.

324.    As a result of Choate's actions, Plaintiff's reputation both at Choate and at New York University have been severely damaged.

325.    Such reputational harm resulted from false and unsupported findings against Plaintiff.

326.    Defendants' unfair practices caused substantial injury to Plaintiff, who was forced to withdraw from the School just days prior to her graduation, deprived of her rightfully earned diploma, robbed of the opportunity to attend graduation alongside her peers, and retain her good name and reputation, and which will continue to cause severe and ongoing harm to her future educational and career opportunities due to the closeknit alumni community that expands beyond Choate Rosemary Hall and extends to the broader professional community and alumni of elite boarding schools. Plaintiff will forever be known as someone who was not permitted to graduate.

327.    In addition, Dean Cox's false disclosure to parents other than Plaintiff's parents (i.e., third parties) about whether Plaintiff had permission to stay over E.S.'s house on the evening of May 24th, caused Plaintiff further reputational damage within the Choate community. This falsehood ("Jaidyn should not have been there based on the form" – a form to which only the School had access) was expressed to Plaintiff's parents and upon information and belief, the falsehood was embraced by several parents. To Plaintiff's knowledge, this falsehood has not been corrected by Choate.

328.    Moreover, given that this misinformation was shared with Plaintiff's parents on the same day as the decision to dismiss Plaintiff (i.e., May 27th),[10] there is some evidence to suggest Dean Cox's prejudicial characterization of Plaintiff was a factor in the decision to dismiss Plaintiff. Cox was one of only two investigators. The deans group committee based its decision on the information provided by the investigators. If Cox shared the information with the committee in addition to parents, this would have constituted a material misrepresentation by an investigator who had the power to sway the committee. In either case, Plaintiff's reputation was harmed.

329.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

330.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

---

[10] Dean Gilyard claimed that he gives himself "24 hours" before finalizing decisions such as the one to dismiss Plaintiff. He told Plaintiff's parents on the afternoon of May 28th that he was going to officially dismiss her by 8:00 PM on the evening of May 28, 2025. This would mean that he decided on the evening of May 27th, notified the Plaintiff and her parents on the afternoon of May 28th, and took official action on the evening of May 28th.

## AS AND FOR A NINTH CAUSE OF ACTION
### Connecticut Unfair Trade Practices Act
### (Against Choate)

331.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

332.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42–110b(a).

333.    The Connecticut Supreme Court has identified three criteria for determining whether an act or practice is "unfair" within the meaning of CUTPA: (i) "whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (ii) whether it is immoral, unethical, oppressive, or unscrupulous; and (iii) whether it causes substantial injury to consumers, [competitors, or other businesspersons]...." *Derisme v. Hunt Leibert Jacobson P.C.,* 880 F. Supp. 2d 339, 374 (D. Conn. 2012).

334.    Importantly, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

335.    In the present matter, Plaintiff paid tuition and fees in exchange for Choate providing educational services to her, which should have culminated in the conveyance of a diploma. *See Day v. Yale Univ. Sch. of Drama,* No. CV 970400876S, 2000 WL 295612, at *4 (Conn. Super. Ct. Mar. 7, 2000).

336.    As described *supra,* Defendants engaged in several unfair practices when carrying out the disciplinary proceedings that led to Plaintiff's forced withdrawal from Choate.

337.    The manner in which the investigation was conducted and the discipline imposed was immoral, unethical, oppressive, or unscrupulous, among other things:

- Defendants failed to conduct a fair and meaningful investigative process and subsequently dismissed reasonable requests from Plaintiff's parents to revisit the process, demonstrating a disregard for both procedural fairness and the gravity of the concerns raised.

- Defendants reached a final decision that lacked the fundamental elements of a fair proceeding including specific notice of the charges, a meaningful opportunity to respond to and contest the charges, and an appeal.

- Defendants targeted Plaintiff as a primary wrongdoer and pressured her to decide between withdrawing from Choate or being subjected to dismissal days after experiencing the trauma of having to go to the emergency room because of Choate's negligence.

- Defendants created a new and unsubstantiated charge in bad faith after the discipline was put into effect to retroactively justify the excessively disproportionate sanction imposed.

- Defendants revised the basis for the intoxication-related charge after it became evident that the original allegation was not merely unartfully worded but was substantively baseless and procedurally improper from inception.

- Defendants, in bad faith, revised and created a charge based on Choate's personal integrity standard after the discipline was put into effect in order to retroactively justify the excessively disproportionate sanction imposed.

338.    Based on the foregoing, Choate's behavior transcended mere governance and discretion and moved into deceptive, immoral, unethical, oppressive, and unscrupulous practices.

339.    Such unfair practices caused substantial injury to Plaintiff, who was forced to withdraw from the School just days prior to her graduation, deprived of her rightfully earned diploma, robbed of the opportunity to attend graduation alongside her peers, and retain her good

name and reputation, and which will continue to cause severe and ongoing harm to her future educational and career opportunities.

340.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to suffer harm to her reputation, a loss of educational and career opportunities, and mental and emotional distress.

341.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    On the first cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)    On the second cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(iii)    On the third cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career

prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(iv)    On the fourth cause of action for lack of informed consent, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(v)    On the fifth cause of action for tortious interference with contract, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vi)    On the sixth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vii)    On the seventh cause of action for unjust enrichment, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(viii)   On the eighth cause of action for defamation, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(ix)   On the ninth cause of action for violation of the Connecticut Unfair Trade Practices Act, a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $1,000,000, including without limitation, damages to reputation, loss of educational and career opportunities, loss of future career prospects, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs, disbursements, and punitive damages; and

(x)   Awarding Plaintiff such other and further relief as deemed just, equitable, and proper.

# JURY DEMAND

The Plaintiff requests a trial before a jury on all issues so triable.


**Dated: New York, New York**
**        November 26, 2025**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Jaidyn Hewlin*

By: */s/ Andrew T. Miltenberg*
   **Andrew T. Miltenberg, Esq. (*pro hac vice* forthcoming)**
   **363 Seventh Avenue, 5th Floor**
   **New York, New York 10001**
   **Telephone: (212) 736-4500**
   amiltenberg@nmllplaw.com


......*/s/ Tara J. Davis*
   **Tara J. Davis, Esq. (*pro hac vice* forthcoming)**
   **101 Federal Street, 19th Floor**
   **Boston, MA 02110**
   **Telephone: (617) 209-2188**
   tdavis@nmllplaw.com

   -and-

**HAYBER, MCKENNA & DINSMORE, LLC**

By: */s/ Deborah L. McKenna*
   **Deborah McKenna**
   **472 Wheelers Farms Rd, Suite 300**
   **Milford, CT 06461**
   **Telephone: (203) 691-6491**
   dmckenna@hayberlawfirm.com
   **Federal Bar No. CT17326**